UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| MATTHEW J. WHITE, | ) |
| | ) |
| PLAINTIFF | ) |
| | ) |
| v. | ) CIVIL NO. 2:17-cv-491-DBH |
| | ) |
| HEWLETT PACKARD ENTERPRISE COMPANY, | ) |
| | ) |
| DEFENDANT | ) |

**DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

In this case I interpret the language of an employer's bonus program, and apply Maine law on accrued vacation pay, access to a personnel file, quantum meruit, and unjust enrichment. I conclude that the defendant employer is entitled to summary judgment on all issues.

The record is far larger than necessary to rule on the motion.[1] I confine myself to the facts that are material. I provide a basic overview at the outset,

---

[1] I have spent an inordinate amount of time deciphering the record as the parties presented it in their dueling statements of material fact. Statements of material fact, responses and replies are supposed to focus the record so that the judge can tell what is truly disputed and what is not. Here, the dueling statements are so argumentative, lengthy, and full of qualifications, objections, and requests to strike that they are basically unusable. For the most part I have bypassed them and focused directly on the plaintiff's deposition and affidavit and the defendant's 30(b)(6) deposition. (According to Fed. R. Civ. P. 56(c)(3), "[t]he court need consider only the cited materials, but it may consider other materials in the record.") I have checked the statements for any supportable challenges to the depositions and affidavit. The defendant attacks consideration of the plaintiff's affidavit under Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1 (1st Cir. 1994). Colantuoni makes clear that later affidavits from "an interested witness" that contradict the witness's deposition testimony are to be disregarded because the plaintiff's "attorney was present at the deposition, and had the opportunity to clarify any incorrect impressions. Moreover, we think it significant that the affidavit was offered only after defendants had filed motions for summary judgment. In these circumstances, we are persuaded that plaintiff's affidavit should be disregarded in considering the propriety of summary judgment." Id. at 4-5 (internal citations omitted). Colantuoni has not affected my consideration of the plaintiff's affidavit.

then introduce other facts as pertinent to the issue being decided. In all instances, I take disputed material facts in the light most favorable to the nonmoving party, the plaintiff.

Jurisdiction is based upon diversity of citizenship, and Maine law applies.

## OVERVIEW

In early 2013 the plaintiff, Matthew J. White, a highly skilled IT professional living in Maine, was recruited by and entered into an employment contract with a previous iteration of the defendant Hewlett Packard Enterprise Company. White Aff. ¶¶ 2, 4, 8 (ECF No. 55-2).[2] I will refer to the defendant as HP. Among other things, HP's offer letter to White stated that he would receive a signing bonus, an annual base salary, ongoing incentive payments based on attaining certain sales goals, and eligibility to participate in the Company's benefit programs. White Dep. Ex. 13 at 1 ( ECF No. 43-5). The offer letter included a link to an online portal (SharePoint) for more benefits information. Id.; White Dep. Tr. at 89:2- 90:22 (ECF No. 45-1).[3] White accepted the offer and performed his work for HP in Maine. See White Aff. ¶ 37.

White voluntarily resigned from HP in July of 2015. Id. ¶ 35. He did not receive accrued unused vacation benefits and did not receive a market share bonus for the last calendar quarter of 2014; he claims that when he requested access to his personnel file, he obtained only partial access. Pl.'s Opposing Statement of Mat. Facts (POSMF)¶ 6 (ECF No. 56).

---

[2] I cite the unredacted, sealed version of the document. The public redacted version is available as well. (ECF No. 56-2).
[3] A public transcript of Mr. White's deposition is available with redactions. (ECF No. 46-1).

White has sued HP for his vacation benefits and his claimed bonus as well as statutory remedies under Maine employment law. He also seeks recovery under Maine's law of quantum meruit and unjust enrichment. After discovery was complete, HP moved for summary judgment. See Def.'s Am. Mot. for Summ. J. (ECF No. 54).

## ANALYSIS

### *Vacation Pay*

A Maine statute requiring full payment of wages at the end of employment states: "Whenever the terms of employment or the employer's established practice includes provisions for paid vacations, vacation pay on cessation of employment has the same status as wages earned." 26 M.R.S.A. § 626. The parties agree that this statute applies to White's employment relationship with HP. In 2009, Maine's Law Court made clear what the statute means in connection with vacation benefits. I take no guidance, therefore, from other states' interpretations of their employment statutes.

In its vacation benefits case, Maine's Law Court held that "[a]lthough section 626 creates a statutory right for former employees to *seek* payment, *entitlement* to payment is governed solely by the terms of the employment agreement. Rowell v. Jones & Vining, Inc., 524 A.2d 1208, 1210-11 (Me. 1987). Therefore, pursuant to section 626, a former employee may only claim what is owed according to the terms of the employment agreement; section 626 does not

modify or supercede its terms." Richardson v. Winthrop Sch. Dep't, 983 A.2d 400, 402 (Me. 2009) (emphasis in original).[4]

The HP vacation benefits policy at issue here states: "Employees are strongly encouraged to use all of their vacation each year—to take time away to refresh, recharge, and enjoy life outside of work. The vacation program *does not include a year-end carryover feature or a payout provision if you leave the Company . . .*" White Dep. Ex. 15 at 14-4 (ECF No. 45-8) (emphasis added). "If you leave [HP] for any reason, either voluntary or involuntary, *you will not receive pay in lieu of unused vacation.* [Except for listed circumstances inapplicable to White], *all unused vacation will be forfeited at the time of your separation.*" Id. at 14-8 (emphasis added).[5] White accepted these terms by accepting HP's employment offer and continuing to work for HP until he voluntarily left the company.

---

[4] The complaint and motion papers mention section 621-A ("Timely and full payment of wages"), but nowhere do they identify any separate arguments from that section, focusing instead on section 626. I do the same.

[5] White argues that summary judgment should be denied to HP on his claim for accrued vacation benefits because the record does not contain the actual policy that was in effect in 2014 and 2015. Pl.'s Opp'n at 28 (ECF No. 57). The record does contain the 2013 version, see White Aff. attachment (ECF No. 55-2) (referred to as Ex. A in Aff. ¶ 38, but attached as pp. 11-33 of the ECF document); see also Karr Aff. Ex. 1 at 15-27 (ECF No. 83-2), and the 2016 version, White Dep. Ex. 15 (ECF No. 45-8). HP's 30(b)(6) designee testified that there had been no change in this vacation forfeiture provision, Powell Dep. Tr. at 26-27, 149-52, 158 (ECF No. 45-11) (a public, redacted version is available at ECF No. 46-20), and there is no evidence to the contrary. Summary judgment is not the time to litigate discovery issues; if HP failed to produce a document, White could have sought relief before the Magistrate Judge during discovery. What I have as a record now is uncontested testimony that the provisions quoted in text are the terms of the policy that applied to White. The change in HP's corporate structure and the absence of the physical 2014 and 2015 documents from the record do not create a genuine dispute as to any material fact concerning the terms of the policy as they affect White. The plaintiff's lawyer's observation that, between 2013 and 2016, Rhode Island was added as an excepted state in applying the vacation policy, Rachin Aff. ¶ 9 (ECF No. 58), does not alter that conclusion.

I conclude that according to the italicized language, the terms of the employment agreement between White and HP did not entitle White to accrued vacation benefits when he left the company. Therefore section 626 affords him no relief. A contrary result would read those forfeiture provisions out of the employment contract, counter to the teaching of Richardson, 983 A.2d at 402-03, and Rowell v. Jones & Vining, Inc., 524 A.2d 1208, 1210-11 (Me. 1987).[6]

***Bonus***

The Fiscal Year 2014 HP Global Sales Compensation Policy (Compensation Policy) (ECF No. 43-2), about which White testified at his deposition (White Dep. Tr. at 29 et seq.) (discussing Ex. 3), describes the operation of bonus programs. According to the Policy, "[a] bonus program is a sales result, achievement-based incentive program with a specified beginning and end date which is offered to a defined sales population to meet a certain sales focus." Compensation Policy § 5.1. For fiscal year 2014, White testified that a communication, most likely sent via email, notified him of a sales letter with a link to the bonus program's portal (SharePoint), White Dep. Tr. at 31:6-34:17, and that he accepted it either actively or passively (both methods were allowed under the sales letter). The bonus program in question is "2H US DIA Team Market Share Bonus," with "2H" referring to the second half of HP's fiscal year.[7] According to that Market Share Bonus program's terms, a part of its objective "is incenting the DIA Team to

---

[6] This court has applied Rowell in Snow v. Borden, 802 F. Supp. 550, 554 (D. Me. 1992), upholding a year-end forfeiture provision in a vacation benefits policy, and in Gibson v. Power Maint. Int'l, Inc., 2002 WL 31399791, at *6 (D. Me. Oct. 24, 2002), R.&R. adopted, 2002 WL 31744223 (D. Me. Dec. 4, 2002), upholding an involuntary termination forfeiture provision for vacation benefits.

[7] White Dep. Tr. at 80.

specifically slow down the CISCO market share gain." White Dep. Ex. 7 (ECF No. 45-3).[8] White was a member of the DIA team eligible for the bonus. White earned and was paid this type of bonus a couple of times during his HP employment. White Dep. Tr. at 55:10-19, 109:21-110:1.

As White contends, bonus-based compensation is within section 626's protection of wages. Pl.'s Am. Opp'n at 19 (ECF No. 80). This court has stated that "Maine's wages statute applies with equal force to incentive and bonus-based compensation as it does to 'wages.'" OfficeMax Inc. v. County Qwik Print, Inc., 802 F. Supp. 2d 271, 283-84 (D. Me. 2011). Also, as White argues, "[o]nce a non-discretionary bonus is earned, it must be paid. The terms of the Market Share Bonus were non-discretionary." Pl.'s Am. Opp'n at 19 (internal citation omitted). I turn therefore to the Market Share Bonus program terms applicable to White's claim.

The document establishing this Market Share Bonus plan[9] says that the Program Start Date is May 1, 2014, and the Program End Date is October 31, 2014.[10] That is congruent with the second half of HP's fiscal year, which runs from November 1 to October 31. The Market Share Bonus plan document also

---

[8] The focus was the enterprise server product market, especially blade servers. Powell Dep. Tr. at 35; White Dep. Tr. at 51 (redacted).

[9] HP says that White had this document in his possession. Def.'s Am. Mot. for Summ. J. at 7-8 (ECF No. 54); Def.'s Statement of Material Facts (SOMF) ¶ 34) (ECF No. 48) (citing White Dep. Tr. at 135-36). White denies it. Pl.'s Opposing Statement of Mat. Facts (POSMF) ¶ 34 (ECF No. 56) (citing White Dep. Tr. at 33:16-34:12). What HP's designated transcript pages establish is that White had the document to turn over to HP in discovery but does not know when he received it and that it would have been unusual for him to seek this type of detail during his employment. What White's designated transcript pages establish is that the HP portal was often not operable but that no one ever denied White access to the document. White also testified "If this is the documentation, then it's probably accurate." White Dep. Tr. at 82:21-22. If this is a dispute, it appears to be a tempest in a teapot because both White and HP proceed on the premise that the document contains the binding terms of the bonus program, as do I.

[10] See White Dep. Ex. 8 (ECF 43-4).

6

says that HP relies upon a third party to provide the metrics (public market share reports) that determine whether and how much of a bonus is due, and that the third party provides that information on a calendar quarter basis. White Dep. Ex. 8 (ECF No. 43-4); see also Powell Dep. Tr. at 79:4-80:4, 81:9-25 (ECF No. 45-11). Under Program Eligibility Details, the Market Share Bonus plan document states expressly: "Bonus periods are based upon Calendar Quarter results."

The difference between calendar and fiscal quarters was immaterial as long as the bonus program was renewed. But at the end of October 31, 2014, the market share bonus program was not renewed, see White Dep. Tr. at 19:18-20:15, 33:2-3, and HP made no bonus payout to the DIA team for results that occurred in the final *calendar* quarter of 2014. The calendar/fiscal year difference made operation of this bonus program complex, but it was not unclear[11] or ambiguous. Specifically, the bonus program ended October 31, 2014. That means the last calendar quarter that could generate the bonus was the third calendar quarter of 2014, *i.e.*, July through September. A bonus for that period was paid. White wants to be paid a bonus for his work in October through December of 2014 as well, but that calendar quarter does not qualify under the explicit language of the program. White did not testify that he had any different understanding. Instead, White testified that it would be rare for

---

[11] The plaintiff cites an email from the team manager that the bonus program was "absolutely unclear." Pl.'s Am. Opp'n at 5 (ECF No. 80) (citing Pl.'s Add'l Statement of Mat. Facts ¶ 148 (ECF No. 75) (in turn citing Pl.'s Consent Mot. to Seal Ex. 1 at 13 (ECF No. 55-1))). That is an overstatement; the email was in February of 2014 and referred to the *date of the actual payment*, then scheduled for March 2014. Pl.'s Consent Mot. to Seal Ex. 1 at 13. The plaintiff is somewhat more circumspect at page 20 of his opposition, Pl.'s Am. Opp'n ("payout terms were 'absolutely unclear'"), citing POSMF ¶ 12, where the reference is to receiving the bonus in March and the manager's email that the information about getting the payout in March "was absolutely unclear."

7

him to seek out this kind of information, White Dep. Tr. at 136, and that he therefore relied on HP to handle it. I conclude that HP did not misapply the bonus program terms by not awarding the DIA team a Market Share Bonus for the fourth calendar quarter of 2014.[12]

White's opposition to summary judgment on this topic argues bait and switch in recruiting employees, confusion about entitlement to the bonus among the sales force,[13] and debate within HP about how to administer the bonus programs and whether to pay the DIA team a bonus for 2014 calendar fourth quarter results (which were positive). All of that is irrelevant to whether HP was obligated to pay another quarter's bonus under the terms of the written 2H US DIA Team Market Share Bonus plan. It was not.

***Quantum Meruit and Unjust Enrichment***

White argues that regardless of the terms of the Market Share Bonus plan, he should receive payment for the DIA team's success in calendar fourth quarter 2014 under Maine's remedies of quantum meruit (implied contract) and unjust enrichment. But written terms defined the Market Share Bonus plan. If those terms were met, then the DIA team was entitled to the bonus under the terms of the agreement.[14] As White argues, Opp'n at 19, it was not discretionary. But

---

[12] As a separate basis for summary judgment, HP argues that White did not qualify because he was not a member of the DIA team for the entire fourth calendar quarter of 2014 inasmuch as effective November 1 he became a member of the DCA team. Def.'s Am. Mot. for Summ. J. at 9-10. This contention has generated countless pages of argument and differing assertions over the nature of White's responsibilities, and whether the change in teams was substantive or mere nomenclature. But HP's 30(b)(6) designee was asked specifically: "Any other reason aside from [the end of the bonus plan as of October 31] that it was not paid?"; he answered: "No other reason." Powell Dep. Tr. at 96:21-23. I therefore do not consider HP's alternative argument.
[13] White testified that he was confused. White Dep. Tr. at 52:12; see also 61.
[14] That is how Maine's Law Court approached the topic in determining whether a separate commission memorandum could be enforced under section 626 in Bernier v. Merrill Air Engineers, 770 A.2d 97, 101 (Me. 2001). The Law Court treated it as an "agreement," id. at 3,

8

because the plan terms defined whether and when payment was due, White's remedies are limited to those plan terms. He cannot recover for quantum meruit or unjust enrichment in place of what was due under the terms of the plan. White cites the First Circuit case of Hodgkins v. New England Telephone Co., Pl.'s Am. Opp'n at 27, which construed Maine law on unjust enrichment and quantum meruit in 1996. I read that case as contrary to White's position. After finding an enforceable agreement between an employer and employee, the Hodgkins court said:

> Without evidence of fraud, or other circumstances that render the contract inoperative, [the employee] is foreclosed from seeking additional payment outside the contract terms. See *Top of the Track*, 654 A.2d at 1296 (contract between the parties forecloses unjust enrichment claim); *Prest v. Inhabitants of Farmington*, 117 Me. 348, 104 A. 521, 524 (1918) (valid express contract forecloses a quantum meruit action). Because [the employee] has put forth no such evidence, we agree with the district court that [the employee's] unjust enrichment and quantum meruit claims must fail.

Hodgkins v. New England Telephone Co., 82 F.3d 1226, 1232 (1st Cir. 1996). White has shown no basis for concluding that Maine law on this topic has changed since Hodgkins. The Market Share Bonus plan as offered by HP and accepted by White through his continuing employment amounted to a contract. Because White failed to qualify under the terms of that bonus plan, he cannot obtain relief under quantum meruit or unjust enrichment.

---

and upheld the trial court's ruling enforcing it according to its written terms. Confusingly, HP treats White's claim as "focuse[d] on a bonus program offered over and above any contractual relationship negotiated between the parties." Def.'s Am. Mot. for Summ. J. at 14. If HP offered the bonus program, which it did, and if White performed under it, which he did, then there was a contract. See Restatement (Second) of Contracts § 50 (1981) cmt. b (describing acceptance by performance). This case is unlike Officemax Inc. v. Sousa, 773 F. Supp. 2d 190, 227-29 (D. Me. 2011), where Judge Woodcock found a bonus program *not* contractual because of explicit language in the program that it was not contractual and "other provisions in the document that would render it a contractual nullity."

*Access to Personnel File*

A Maine statute provides that if an employer has a personnel file for an employee, the employee has a right to review and copy it. 26 M.R.S.A. § 631. It allows injunctive relief against an employer "who, following a request pursuant to this section, without good cause fails to provide an opportunity for review and copying of a personnel file, within 10 days of receipt of that request." Id.[15] A successful plaintiff may also recover costs and a reasonable attorney's fee. Id. White seeks relief under this statute.

There may be an issue whether White properly requested access. The statute directs that "[t]he reviews and copying must take place at the location where the personnel files are maintained and during normal office hours unless, at the employer's discretion, a more convenient time and location for the employee are arranged." Id. In a 1993 Maine Superior Court case, the plaintiff's lawyer had "requested that he be sent a copy of plaintiff's personnel file." Richardson v. Town of Rangeley, 1993 Me. Super. LEXIS 109, at *8. Justice Alexander stated that "[t]he law only requires that a person seeking access to their personnel file be given access to that file at the appropriate personnel office. There is no evidence that the defendants ever denied plaintiff access to his personnel file at defendants' offices as required by 26 M.R.S.A. § 631." Id. White seems to argue that because HP is large and international, he was not required to seek access at HP's HR office location, wherever that might be. Pl.'s Am. Opp'n at 29. This part of the statute may indeed need reworking for today's world

---

[15] The statute also allows a civil forfeiture up to $500, but the forfeiture is collectible by the Maine Department of Labor. See Boylan v. Foster Carpenter Black & Co., LLP, 2002 WL 1023514 at *1 (Me. Super. Ct. Apr. 16, 2002).

where cloud-based digital records are replacing physical file folders located in a physical location, where employees work at home—sometimes remotely from any head office or regional office—and where worldwide companies like HP assign HR personnel for an entire country or region,[16] or even outsource various HR responsibilities.

In any event, I find it unnecessary to address this perhaps anachronistic part of the statute. White did ask for his personnel file and HP did send him materials. His claim seems to be that what he received did not contain details of the bonus program and other policies: "Conspicuously absent were detailed bonus plan information, salient emails about why bonuses were not received, HP's global sales policy that was applicable to White's employment, or the U.S. summary Plan Description for benefits like vacation time." Pl.'s Am. Opp'n at 29.[17]

But White has made no showing that the missing items were ever in his "personnel file" or that they should have been. Section 631 says that "a personnel file includes, but is not limited to, any *formal or informal employee evaluations and reports relating to* the employee's character, credit, work habits, compensation and benefits and nonprivileged medical records or nurses' station

---

[16] HP's 30(b)(6) designee testified that HP is "a functional organization throughout the world," with "headquarters . . . in Palo Alto"; that the HR person to whom he spoke in preparation for his deposition was located in Houston Texas; and that HR issues are not all handled out of Houston, and "it really depends on the issue, the group, the type of inquiry." Powell Dep. Tr. at 20-22.

[17] At his deposition, White was unable to identify what personnel file materials were missing, calling that a legal question. See, e.g., White Dep. Tr. at 99: 20-21 (ECF No. 45-1). The quotation in text is his lawyer's statement. Pl.'s Am. Opposing Statement of Material Facts ¶ 35 ("White's counsel can identify the documents that are missing from his personnel file."); see also ¶ 28 (referring to his lawyer's affidavit). The affidavit makes the same description of what was missing. ECF No. 58 ¶¶ 3-5.

notes relating to the employee that the employer has in the employer's possession." (emphasis added). What White thinks he should have received were not "evaluations and reports" relating to White. I conclude that he is unable to show a violation of section 631.

## CONCLUSION

For these reasons, I conclude that the plaintiff cannot recover on any of his claims. The defendant's motion for summary judgment is **GRANTED**.

**SO ORDERED.**

**DATED THIS 11TH DAY OF JUNE, 2019**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**